John MACKEY et al., Appellees,

v.

NATIONAL FOOTBALL LEAGUE et al., Appellants.

No. 76–1184.

United States Court of Appeals, Eighth Circuit.

Submitted June 17, 1976.

Decided Oct. 18, 1976.

Rehearing Denied Nov. 23, 1976

Daniel M. Gribbon, Washington, D. C., John D. French, Minneapolis, Minn., for appellants; James B. Loken, ˙ Minneapolis, Minn., on brief for Natl. Football League and Alvin Ray Rozelle; James C. McKay, Paul J. Tagliabue and Theodore Voorhees, Jr., Covington & Burling, Washington, D. C., and Irving R. Brand, Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., on brief for 26 Member Clubs of the Nat'l. Football League.

Edward M. Glennon, Minneapolis, Minn., for appellees; Mark R. Johnson, Ronald L. Rollins, of Lindquist & Vennum, Minneapolis, Minn., on brief.

Before GIBSON, Chief Judge, LAY and WEBSTER, Circuit Judges.

LAY, Circuit Judge.

This is an appeal by the National Football League (NFL), twenty-six of its member clubs, and its Commissioner, Alvin Ray "Pete" Rozelle, from a district court judgment holding the "Rozelle Rule"[1] to be violative of § 1 of the Sherman Act, and enjoining its enforcement.

This action was initiated by a group of present and former NFL players,[2] appellees herein, pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and § 1 of the Sherman Act, 15 U.S.C. § 1. Their complaint alleged that the defendants' enforcement of the Rozelle Rule constituted an illegal combination and conspiracy in restraint of trade denying professional football players the right to freely contract for their services. Plaintiffs sought injunctive relief and treble damages.

The district court, the Honorable Earl R. Larson presiding, conducted a plenary trial which consumed 55 days and produced a transcript in excess of 11,000 pages. At the conclusion of trial, the court entered extensive findings of fact and conclusions of law.[3] The court granted the injunctive relief sought by the players and entered judgment in their favor on the issue of liability.[4] This appeal followed.

The district court held that the defendants' enforcement of the Rozelle Rule constituted a concerted refusal to deal and a group boycott, and was therefore a *per se* violation of the Sherman Act. Alternatively, finding that the evidence offered in support of the clubs' contention that the Rozelle Rule is necessary to the successful operation of the NFL insufficient to justify the restrictive effects of the Rule, the court concluded that the Rozelle Rule was invalid under the Rule of Reason standard. Finally, the court rejected the clubs' argument that the Rozelle Rule was immune from attack under the Sherman Act because it had been the subject of a collective bargaining agreement between the club owners and the National Football League Players Association (NFLPA).

The defendants raise two basic issues on this appeal: (1) whether the so-called labor exemption to the antitrust laws immunizes the NFL's enforcement of the Rozelle Rule from antitrust liability; and (2) if not, whether the Rozelle Rule and the manner in which it has been enforced violate the anti-

---

1. The Rozelle Rule essentially provides that when a player's contractual obligation to a team expires and he signs with a different club, the signing club must provide compensation to the player's former team. If the two clubs are unable to conclude mutually satisfactory arrangements, the Commissioner may award compensation in the form of one or more players and/or draft choices as he deems fair and equitable.

2. The suit was initiated by 36 players as a class action; however, the class action allegations were later withdrawn. At the commencement of trial, there remained 16 of the original plaintiffs. Six of them, Kermit Alexander, Kenneth

Bowman, William Curry, Thomas Keating, John Mackey and Alan Page, sought only injunctive relief under Count I of the complaint. The remaining 10, Ocie Austin, Marlin Briscoe, Daniel Connors, Richard F. Gordon, John Henderson, Clint Jones, Gene Washington, Charles West, John Williams and Nate Wright, sought both injunctive relief and damages under Count II. Connors later withdrew his claim.

3. The district court's opinion is reported at 407 F.Supp. 1000 (D.Minn.1975).

4. Trial on the issue of damages was deferred pending the disposition of this appeal.

trust laws. Ancillary to these contentions, appellants attack a number of the district court's findings of fact and raise several subsidiary issues.

HISTORY.

We first turn to a brief examination of the pertinent history and operating principles of the National Football League.

The NFL, which began operating in 1920, is an unincorporated association comprised of member clubs which own and operate professional football teams. It presently enjoys a monopoly over major league professional football in the United States. The League performs various administrative functions, including organizing and scheduling games, and promulgating rules. A constitution and bylaws govern its activities and those of its members. Pete Rozelle, Commissioner of the NFL since 1960, is an employee of the League and its chief executive officer. His powers and duties are defined by the NFL Constitution and Bylaws.

Throughout most of its history, the NFL's operations have been unilaterally controlled by the club owners. In 1968, however, the NLRB recognized the NFLPA as a labor organization, within the meaning of 29 U.S.C. § 152(5), and as the exclusive bargaining representative of all NFL players, within the meaning of 29 U.S.C. § 159(a). Since that time, the NFLPA and the clubs have engaged in collective bargaining over various terms and conditions of employment. Two formal agreements have resulted. The first, concluded in 1968, was in effect from July 15, 1968 to February 1, 1970. The second, entered into on June 17, 1971, was made retroactive to February 1, 1970, and expired on January 30, 1974. Since 1974, the parties have been negotiating; however, they have not concluded a new agreement.

For a number of years, the NFL has operated under a reserve system whereby every player who signs a contract with an NFL club is bound to play for that club, and no other, for the term of the contract plus one additional year at the option of the club. The cornerstones of this system are § 15.1 of the NFL Constitution and Bylaws, which requires that all club-player contracts be as prescribed in the Standard Player Contract adopted by the League, and the option clause embodied in the Standard Player Contract.[5] Once a player signs a Standard Player Contract, he is bound to his team for at least two years. He may, however, become a free agent at the end of the option year by playing that season under a renewed contract rather than signing a new one. A player "playing out his option" is subject to a 10% salary cut during the option year.

Prior to 1963, a team which signed a free agent who had previously been under contract to another club was not obligated to compensate the player's former club. In 1963, after R. C. Owens played out his option with the San Francisco 49ers and signed a contract with the Baltimore Colts, the member clubs of the NFL unilaterally adopted the following provision, now known as the Rozelle Rule, as an amendment to the League's Constitution and Bylaws:

Any player, whose contract with a League club has expired, shall thereupon become a free agent and shall no longer be considered a member of the team of that club following the expiration date of such contract. Whenever a player, be-

---

**5.** Paragraph 10 of the Standard Player Contract contains the following option clause:

The Club may, by sending notice in writing to the Player, on or before the first day of May following the football season referred to in ¶ 1 hereof, renew this contract for a further term of one (1) year on the same terms as are provided by this contract, except that (1) the Club may fix the rate of compensation to be paid by the Club to the Player during said further term, which rate of compensa-

tion shall not be less than ninety percent (90%) of the sum set forth in ¶ 3 hereof and shall be payable in installments during the football season in such further term as provided in ¶ 3; and (2) after such renewal this contract shall not include a further option to the Club to renew the contract. The phrase "rate of compensation" as above used shall not include bonus payments or payments of any nature whatsoever and shall be limited to the precise sum set forth in ¶ 3 hereof.

coming a free agent in such manner, thereafter signed a contract with a different club in the League, then, unless mutually satisfactory arrangements have been concluded between the two League clubs, the Commissioner may name and then award to the former club one or more players, from the Active, Reserve, or Selection List (including future selection choices) of the acquiring club as the Commissioner in his sole discretion deems fair and equitable; any such decision by the Commissioner shall be final and conclusive.

This provision, unchanged in form, is currently embodied in § 12.1(H) of the NFL Constitution. The ostensible purposes of the rule are to maintain competitive balance among the NFL teams and protect the clubs' investment in scouting, selecting and developing players.[6]

During the period from 1963 through 1974, 176 players played out their options.[7] Of that number, 34 signed with other teams. In three of those cases, the former club waived compensation. In 27 cases, the clubs involved mutually agreed upon compensation. Commissioner Rozelle awarded compensation in the four remaining cases.[8]

We turn now to the contentions of the parties.

## THE LABOR EXEMPTION ISSUE.

We review first the claim that the labor exemption immunizes the Commissioner and the clubs from liability under the antitrust laws. Analysis of this contention requires a basic understanding of the legal principles surrounding the labor exemption

and consideration of the factual record developed at trial.

*History.*

■ The concept of a labor exemption from the antitrust laws finds its basic source in §§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17 and 29 U.S.C. § 52, and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105 and 113. Those provisions declare that labor unions are not combinations or conspiracies in restraint of trade, and specifically exempt certain union activities such as secondary picketing and group boycotts from the coverage of the antitrust laws. *See Connell Co. v. Plumbers & Steamfitters*, 421 U.S. 616, 621–22, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). The statutory exemption was created to insulate legitimate collective activity by employees, which is inherently anticompetitive but is favored by federal labor policy, from the proscriptions of the antitrust laws. *See Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940).

■ The statutory exemption extends to legitimate labor activities unilaterally undertaken by a union in furtherance of its own interests. *See United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941). It does not extend to concerted action or agreements between unions and non-labor groups. The Supreme Court has held, however, that in order to properly accommodate the congressional policy favoring free competition in business markets with the congressional policy favoring collective bargaining under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, certain union-employer agreements

---

**6.** The NFL has adopted a number of other rules and practices designed to maintain competitive balance and protect the clubs' investment in player development costs which are not at issue here. Among them are the option clause and Standard Player Contract, discussed above, the college draft and no-tampering rules. The operation and effect of these provisions are discussed in the district court's opinion, *supra*, 407 F.Supp. at 1005–06. *See also Smith v. Pro-Football*, 542 F.Supp. 462 (D.D.C.1976); *Kapp v. National Football League*, 390 F.Supp. 73 (N.D.Cal.1974). Our determination here is

not to be taken as indicative of our views on the validity of these other provisions.

**7.** This figure includes four players whose contracts expired for reasons other than playing out their options.

**8.** The players involved in those instances were Pat Fischer, Dave Parks, Phil Olsen and Dick Gordon. The circumstances of these cases are detailed in the district court's opinion, *supra*, 407 F.Supp. at 1004–05.

must be accorded a limited nonstatutory exemption from antitrust sanctions. *See Connell Co. v. Plumbers & Steamfitters, supra; Meat Cutters v. Jewel Tea*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). *See generally* Morris, *The Developing Labor Law* 807–16 (1971).[9]

■ The players assert that only employee groups are entitled to the labor exemption and that it cannot be asserted by the defendants, an employer group. We must disagree. Since the basis of the nonstatutory exemption is the national policy favoring collective bargaining, and since the exemption extends to agreements, the benefits of the exemption logically extend to both parties to the agreement. Accordingly, under appropriate circumstances, we find that a non-labor group may avail itself of the labor exemption. *See Meat Cutters v. Jewel Tea, supra*, 381 U.S. at 729–30, 85 S.Ct. 1596 (opinion of Justice Goldberg); *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840, 847 n. 14 (3rd Cir. 1974); *National Ass'n of Broadcast Employees & Technicians v. International Alliance of Theatrical Stage Employees*, 488 F.2d 124 (9th Cir. 1973); *Intercontinental Container Transp. Corp. v. N.Y. Shipping Ass'n*, 426 F.2d 884 (2nd Cir. 1970); *Cordova v. Bache & Co.*, 321 F.Supp. 600 (S.D.N.Y.1970).[10]

The clubs and the Commissioner claim the benefit of the nonstatutory labor exemption here, arguing that the Rozelle Rule was the subject of an agreement with the players union and that the proper accommodation of federal labor and antitrust policies requires that the agreement be deemed immune from antitrust liability. The plaintiffs assert that the Rozelle Rule was the product of unilateral action by the clubs

and that the defendants cannot assert a colorable claim of exemption.

To determine the applicability of the nonstatutory exemption we must first decide whether there has been any agreement between the parties concerning the Rozelle Rule.

*The Collective Bargaining Agreements.*

■ The district court found that neither the 1968 nor the 1970 collective bargaining agreement embodied an agreement on the Rozelle Rule, and that the union has never otherwise agreed to the Rule. Ordinarily, we review findings of fact under the clearly erroneous standard. F.R.C.P. 52(a). We note, however, that to the extent that these findings turn upon a construction of the parties' collective bargaining agreements, which are before this court, we are not required to defer to the interpretation given them by the district court. *See Frito-Lay, Inc. v. So Good Potato Chip Co.*, 540 F.2d 927 (8th Cir. 1976). We look, then, to the parties' collective bargaining history.

*The 1968 Agreement.*

At the outset of the negotiations preceding the 1968 agreement, the players did not seek elimination of the Rozelle Rule but felt that it should be modified. During the course of the negotiations, however, the players apparently presented no concrete proposals in that regard and there was little discussion concerning the Rozelle Rule. At trial, Daniel Shulman, a bargaining representative of the players, attributed their failure to pursue any modifications to the fact that the negotiations had bogged down on other issues and the union was not strong enough to persist.

9. As the Supreme Court stated in *Connell Co. v. Plumbers & Steamfitters*, 421 U.S. 616, at 622, 95 S.Ct. 1830, at 1835, 44 L.Ed.2d 418 (1975): "[t]he nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions."

10. As stated by the Third Circuit in *Scooper Dooper, Inc. v. Kraftco Corp.*, 494 F.2d 840 (1974), at 847 n. 14:

We reject Scooper Dooper's contention that the labor exemption is unavailable to employers. Such a proposition would undermine the vitality of the exemption by discouraging bargaining on the part of management. To preserve the integrity of the negotiating process, employers who bargain in good faith must be entitled to claim the antitrust exemption. *See Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.*, 351 F.Supp. 462, 499 (E.D.Pa.1972).

The 1968 agreement incorporated by reference the NFL Constitution and Bylaws, of which the Rozelle Rule is a part. Furthermore, it expressly provided that free agent rules shall not be amended during the life of the agreement.

### The 1970 Agreement.

At the start of the negotiations leading up to the 1970 agreement, it appears that the players again decided not to make an issue of the Rozelle Rule. The only reference to the Rule in the union's formal proposals presented at the outset of the negotiations was the following:

> The NFLPA is disturbed over reports from players who, after playing out their options, are unable to deal with other clubs because of the Rozelle Rule. A method should be found whereby a free agent is assured the opportunity to discuss contract with all NFL teams.

There was little discussion of the Rozelle Rule during the 1970 negotiations.

Although the 1970 agreement failed to make any express reference to the Rozelle Rule, it did contain a "zipper clause":

> [T]his Agreement represents a complete and final understanding on all bargainable subjects of negotiation among the parties during the term of this Agreement * * *.

While the agreement did not expressly incorporate by reference the terms of the NFL Constitution and Bylaws, it did require all players to sign the Standard Player Contract, and provided that the Standard Contract shall govern the relationship between the clubs and the players. The Standard Player Contract, in turn, provided that the player agreed at all times to comply with and be bound by the NFL Constitution and Bylaws. At trial, Tex Schramm, a

bargaining representative of the club owners, and Alan Miller, a bargaining representative of the players, testified that it was their understanding that the Rozelle Rule would remain in effect during the term of the 1970 agreement.

Since the beginning of the 1974 negotiations, the players have consistently sought the elimination of the Rozelle Rule. The NFLPA and the clubs have engaged in substantial bargaining over that issue but have not reached an accord. Nor have they concluded a collective bargaining agreement to replace the 1970 agreement which expired in 1974.

Based on the fact that the 1968 agreement incorporated by reference the Rozelle Rule and provided that free agent rules would not be changed, we conclude that the 1968 agreement required that the Rozelle Rule govern when a player played out his option and signed with another team. Assuming, without deciding, that the 1970 agreement embodied a similar understanding, we proceed to a consideration of whether the agreements fall within the scope of the nonstatutory labor exemption.

### Governing Principles.

■ Under the general principles surrounding the labor exemption, the availability of the nonstatutory exemption for a particular agreement turns upon whether the relevant federal labor policy is deserving of pre-eminence over federal antitrust policy under the circumstances of the particular case. *See Connell Co. v. Plumbers & Steamfitters, supra; Meat Cutters v. Jewel Tea, supra; Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

Although the cases giving rise to the nonstatutory exemption[11] are factually dis-

---

11. *Connell Co. v. Plumbers & Steamfitters, supra; Meat Cutters v. Jewel Tea,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Allen Bradley Co. v. Local 3, IBEW,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945). The facts and holdings in these cases have been set forth at length elsewhere and need not be reiterated here. *See e.*

g., *Bodine Produce, Inc. v. United Farm Workers Organizing Comm.,* 494 F.2d 541, 544–56 (9th Cir. 1974); *Robertson v. National Basketball Ass'n,* 389 F.Supp. 867, 884–89 (S.D.N.Y. 1975). For a thorough analysis of these cases and the labor exemption in general, *see* Siegel, Connolly & Walker, *The Antitrust Exemption for Labor-Magna Carta or Carte Blanche?,* 13 Duquesne L.Rev. 411 (1975); Meltzer, *Labor*

similar from the present case,[12] certain principles can be deduced from those decisions governing the proper accommodation of the competing labor and antitrust interests involved here.

We find the proper accommodation to be: First, the labor policy favoring collective bargaining may potentially be given pre-eminence over the antitrust laws where the restraint on trade primarily affects only the parties to the collective bargaining relationship. *See Connell Co. v. Plumbers & Steamfitters, supra; Meat Cutters v. Jewel Tea, supra; Mine Workers v. Pennington, supra.*[13] Second, federal labor policy is implicated sufficiently to prevail only where

the agreement sought to be exempted concerns a mandatory subject of collective bargaining. *See Meat Cutters v. Jewel Tea, supra; Mine Workers v. Pennington, supra.*[14] Finally, the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bona fide arm's-length bargaining. *See Meat Cutters v. Jewel Tea, supra. See also Smith v. Pro-Football,* 542 F.Supp. 462 (D.D.C.1976); *Philadelphia World Hockey Club v. Philadelphia Hockey Club,* 351 F.Supp. 462, 496–500 (E.D.Pa.1972); *Boston Professional Hockey Ass'n, Inc. v. Cheevers,* 348 F.Supp.

---

*Unions, Collective Bargaining, and the Antitrust Laws,* 32 U.Chi.L.Rev. 659 (1965); *Comment, Labor's Antitrust Exemption After Pennington and Jewel Tea,* 66 Colum.L.Rev. 742 (1966).

12. A similar observation was made by Justice Marshall in his dissenting opinion in *Flood v. Kuhn,* 407 U.S. 258, 288, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). In reference to a contention asserted by major league baseball club owners that baseball's reserve system was incorporated into a collective bargaining agreement and was therefore immune from antitrust scrutiny, Justice Marshall stated at 294, 92 S.Ct. at 2118:

This Court has faced the interrelationship between the antitrust laws and the labor laws before. The decisions make several things clear. First, "benefits to organized labor cannot be utilized as a cat's-paw to pull employer's chestnuts out of the antitrust fires." *United States v. Women's Sportswear Manufacturers Assn.,* 336 U.S. 460, 464 [69 S.Ct. 714, 93 L.Ed. 805] (1949). See also *Allen Bradley Co. v. Local Union No. 3,* 325 U.S. 797 [65 S.Ct. 1533, 89 L.Ed. 1939] (1945). Second, the very nature of a collective-bargaining agreement mandates that the parties be able to "restrain" trade to a greater degree than management could do unilaterally. *United States v. Hutcheson,* 312 U.S. 219 [61 S.Ct. 463, 85 L.Ed. 788] (1941); *United Mine Workers v. Pennington,* 381 U.S. 657 [85 S.Ct. 1585, 14 L.Ed.2d 626] (1965); *Amalgamated Meat Cutters v. Jewel Tea,* 381 U.S. 676 [85 S.Ct. 1596, 14 L.Ed.2d 640] (1965); cf., *Teamsters Union v. Oliver,* 358 U.S. 283 [79 S.Ct. 297, 3 L.Ed.2d 312] (1959). Finally, it is clear that some cases can be resolved only by examining the purposes and the competing interests of the labor and antitrust statutes and by striking a balance.

It is apparent that none of the prior cases is precisely in point. They involve union-management agreements that work to the detriment of management's competitors. In this case, petitioner urges that the reserve system works to the detriment of labor.

13. In *Connell,* the Court observed:

Here Local 100, by agreement with several contractors, made nonunion subcontractors ineligible to compete for a portion of the available work. This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.

*There can be no argument in this case, whatever its force in other contexts, that a restraint of this magnitude might be entitled to an antitrust exemption if it were included in a lawful collective-bargaining agreement.* Cf. *Mine Workers v. Pennington,* 381 U.S. at 664–665, 85 S.Ct. 1585; *Jewel Tea,* 381 U.S. at 689–690, 85 S.Ct. 1596 (opinion of White, J.); *id.,* at 709–713, 732–733, 85 S.Ct. 1596 (opinion of Goldberg, J.).

421 U.S. at 625–26, 95 S.Ct. at 1836–37 (emphasis added).

14. In a concurring and dissenting opinion in *Jewel Tea* and *Pennington,* 381 U.S. at 697, 85 S.Ct. 1585, Justice Goldberg, joined by Justices Harlan and Stewart, suggested that all collective bargaining activity on mandatory subjects of bargaining be deemed exempt from the coverage of the antitrust laws. That test, however, has never been adopted by a majority of the Supreme Court. Rather, a majority of the Court seems to favor an accommodation less heavily weighted in favor of labor policy.

261, 267 (D.Mass.), *remanded on other grounds,* 472 F.2d 127 (1st Cir. 1972).

*Application.*

Applying these principles to the facts presented here, we think it clear that the alleged restraint on trade effected by the Rozelle Rule affects only the parties to the agreements sought to be exempted. Accordingly, we must inquire as to the other two principles: whether the Rozelle Rule is a mandatory subject of collective bargaining, and whether the agreements thereon were the product of bona fide arm's-length negotiation.[15]

*Mandatory Subject of Bargaining.*[16]

■ Under § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d), mandatory subjects of bargaining pertain to "wages, hours, and other terms and conditions of employment. . . ." *See NLRB v. Borg-Warner Corp.,* 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). Whether an agreement concerns a mandatory subject depends not on its form but on its practical effect. *See Federation of Musicians v. Carroll,* 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968). Thus, in *Meat Cutters v. Jewel Tea, supra,* the Court held that an agreement limiting retail marketing hours concerned a mandatory subject because it affected the particular hours of the day which the employees would be required to work. In *Teamsters Union v. Oliver,* 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), an agreement fixing minimum equipment rental rates paid to truck owner-drivers was held to concern a mandatory bargaining subject because it directly affected the driver wage scale.

■ In this case the district court held that, in view of the illegality of the Rozelle Rule under the Sherman Act, it was "a nonmandatory, illegal subject of bargaining." We disagree. The labor exemption presupposes a violation of the antitrust laws. To hold that a subject relating to wages, hours and working conditions becomes nonmandatory by virtue of its illegality under the antitrust laws obviates the labor exemption. We conclude that whether the agreements here in question relate to a mandatory subject of collective bargaining should be determined solely under federal labor law. *Cf. Meat Cutters v. Jewel Tea, supra.*

■ On its face, the Rozelle Rule does not deal with "wages, hours and other terms or conditions of employment" but with inter-team compensation when a player's contractual obligation to one team expires and he is signed by another. Viewed as such, it would not constitute a mandatory subject of collective bargaining. The district court found, however, that the Rule operates to restrict a player's ability to move from one team to another and depresses player salaries. There is substantial evidence in the record to support these findings. Accordingly, we hold that the Rozelle Rule constitutes a mandatory bargaining subject within the meaning of the National Labor Relations Act.

*Bona Fide Bargaining.*

■ The district court found that the parties' collective bargaining history reflected nothing which could be legitimately characterized as bargaining over the Rozelle Rule; that, in part due to its recent formation and inadequate finances, the NFLPA, at least prior to 1974, stood in a relatively weak bargaining position vis-a-vis

---

**15.** As stated in *Jewel Tea, supra*:

Thus the issue in this case is whether the . . . restriction . . . is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act.

381 U.S. at 689–90, 85 S.Ct. at 1602.

**16.** At trial, appellants contended that this issue should be decided in the first instance by the NLRB under the doctrine of primary jurisdiction. We find no merit to this claim for the reasons relied on by Justice White in rejecting a similar contention in *Meat Cutters v. Jewel Tea, supra,* 381 U.S. at 684–88, 85 S.Ct. 1596.

the clubs; and that "the Rozelle Rule was unilaterally imposed by the NFL and member club defendants upon the players in 1963 and has been imposed on the players from 1963 through the present date."

On the basis of our independent review of the record, including the parties' bargaining history as set forth above, we find substantial evidence to support the finding that there was no bona fide arm's-length bargaining over the Rozelle Rule preceding the execution of the 1968 and 1970 agreements. The Rule imposes significant restrictions on players, and its form has remained unchanged since it was unilaterally promulgated by the clubs in 1963. The provisions of the collective bargaining agreements which operated to continue the Rozelle Rule do not in and of themselves inure to the benefit of the players or their union. Defendants contend that the players derive indirect benefit from the Rozelle Rule, claiming that the union's agreement to the Rozelle Rule was a *quid pro quo* for increased pension benefits and the right of players to individually negotiate their salaries. The district court found, however, that there was no such *quid pro quo,* and we cannot say, on the basis of our review of the record, that this finding is clearly erroneous.[17]

In view of the foregoing, we hold that the agreements between the clubs and the players embodying the Rozelle Rule do not qualify for the labor exemption. The union's acceptance of the status quo by the continuance of the Rozelle Rule in the initial collective bargaining agreements under the circumstances of this case cannot serve to immunize the Rozelle Rule from the scrutiny of the Sherman Act.[18]

### ANTITRUST ISSUES.

■ We turn, then, to the question of whether the Rozelle Rule, as implemented, violates § 1 of the Sherman Act, which declares illegal "every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The district court found the Rozelle Rule to be a *per se* violation of the Act. Alternatively, the court held the Rule to be violative of the Rule of Reason standard.[19]

### *Players' Services as a Product Market.*

■ The clubs and the Commissioner first urge that the only product market arguably affected by the Rozelle Rule is the market for players' services, and that the restriction of competition for players' services is not a type of restraint proscribed by the Sherman Act. In support of this contention, defendants rely on § 6 of the Clayton Act, 15 U.S.C. § 17, and on language construing that statute in *Apex Hosiery Co.*

---

**17.** Appellants' *quid pro quo* argument rests primarily on the following testimony of Alan Miller, a bargaining representative of the players, concerning the 1970 negotiations:

There were times when I personally can recall, for example, one point when the NFL owners were taking the position that the NFL players must bargain their individual salaries collectively, for example, all quarterbacks are here to here, all tight ends are here to here, the flankers are making so much, a bonus for anything over three touchdowns, et cetera, et cetera.

I remember specifically at that point telling somebody that if that's the way they wanted to bargain that we would, you know, consider making the Rozelle Rule and the abolishment of that rule a direct issue in the negotiations, that's the only recollection I have of that actually coming up; in itself it was not a major topic of discussion.

We cannot agree that this testimony is indicative of a *quid pro quo.* First, the colloquy related by Miller seems to have been a side discussion rather than a focal point of the negotiations. Second, at the time this interchange occurred, the clubs had already agreed to individual salary negotiations in a separate agreement.

**18.** In view of our holding, we need not decide whether the effect of an agreement extends beyond its formal expiration date for purposes of the labor exemption.

**19.** It is undisputed that the NFL operates in interstate commerce. It is also recognized that the business of professional football enjoys no special exemption from the antitrust laws. *See Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957).

*v. Leader, supra.* Section 6 of the Clayton Act provides:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

Based on this section, the Supreme Court, in *Apex,* observed:

> [I]t would seem plain that restraints on the sale of the employee's services to the employer, however much they curtail the competition among employees, are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act.

310 U.S. at 503, 60 S.Ct. at 997.

On the surface, the language relied on by defendants lends merit to the defense. However, we cannot overlook the context in which the language arose. Section 6 of the Clayton Act was enacted for the benefit of unions to exempt certain of their activities from the antitrust laws after courts had applied the Sherman Act to legitimate labor activities.[20] *See Meat Cutters v. Jewel Tea, supra,* 381 U.S. at 697, 85 S.Ct. 1596 (opinion of Justice Goldberg); Siegel, Connolly & Walker, *The Antitrust Exemption for Labor—Magna Carta or Carte Blanche?,* 13 Duquesne L.Rev. 411 (1975). In *Apex,* the Court condoned restrictions on competition for employee services imposed by the employees themselves, not by employers.[21]

In other cases concerning professional sports, courts have not hesitated to apply the Sherman Act to club owner imposed restraints on competition for players' services. *See Kapp v. National Football League,* 390 F.Supp. 73 (N.D.Cal.1974); *Robertson v. National Basketball Ass'n,* 389 F.Supp. 867 (S.D.N.Y.1975). *See also Radovich v. National Football League, supra; Smith v. Pro-Football, supra; Boston Professional Hockey Ass'n, Inc. v. Cheevers, supra; Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049 (C.D.Cal.1971), *stay vacated,* 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971) (Justice Douglas, Opinion in Chambers). In other contexts, courts have subjected similar employer imposed restraints to the scrutiny of the antitrust laws. *See Anderson v. Shipowners Ass'n,* 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298 (1926); *Nichols v. Spencer International Press, Inc.,* 371 F.2d 332 (7th Cir. 1967); *Cordova v. Bache & Co., supra.*[22] *See also Mandeville Farms v. Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), in which the Court held that businessman may not act in concert to eliminate competition

---

20. *See e. g., Loewe v. Lawlor,* 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908).

21. *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), concerned a lengthy and violent union strike which impeded the flow of the employer's goods into interstate commerce. The Court found no antitrust violation.

22. In *Cordova v. Bache & Co.,* 321 F.Supp. 600 (S.D.N.Y.1970), securities representatives had alleged a conspiracy among their stock broker-employers to reduce the commissions paid to them. Judge Mansfield stated at 606:

> It is readily apparent that Congress, in enacting § 6, was concerned with the right of labor and similar organizations to continue engaging in such activities, including the right to strike, not with the right of employers to band together for joint action in fixing the wages to be paid by each employer. There is no evidence of the existence of any necessity to protect the latter type of activity at the time when § 6 was enacted. It seems clear that if Congress had wanted to exempt agreements between employers as to the money or compensation that would be paid to their employees, it would not have limited § 6 to exemption of "[t]he labor of a human being" which can be restrained only by the employees or unions controlling the labor itself. Congress would also have provided that compensation offered or paid by employers to employees is not a commodity or article of commerce. This it did not do.

in the procurement of commodities essential to the operation of their businesses.[23]

We hold that restraints on competition within the market for players' services fall within the ambit of the Sherman Act.

*Per Se Violation.*

■ We review next the district court's holding that the Rozelle Rule is *per se* violative of the Sherman Act.

The express language of the Sherman Act is broad enough to render illegal nearly every type of agreement between businessmen. The Supreme Court has held, however, that only those agreements which "unreasonably" restrain trade come within the proscription of the Act. *See Northern Pac. R. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The "Rule of Reason" emerged from these cases.

As the courts gained experience with antitrust problems arising under the Sherman Act, they identified certain types of agreements as being so consistently unreasonable that they may be deemed to be illegal *per se,* without inquiry into their purported justifications. As the Supreme Court stated in *Northern Pac. R. Co. v. United States, supra,* 356 U.S. at 5, 78 S.Ct. at 518:

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

*See generally, Worthen Bank & Trust Co. v. National BankAmericard Inc.,* 485 F.2d 119

(8th Cir. 1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974); Kalinowski, *The Per Se Doctrine—Am Emerging Philosophy of Antitrust Law,* 11 U.C.L.A.L. Rev. 569 (1964).

Among the practices which have been deemed to be so pernicious as to be illegal *per se* are group boycotts and concerted refusals to deal. *See e. g., Klor's v. Broadway-Hale Stores,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild of America v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). *See generally Worthen Bank & Trust Co. v. National BankAmericard Inc., supra.* The term "concerted refusal to deal" has been defined as "an agreement by two or more persons not to do business with other individuals, or to do business with them only on specified terms." *Note, Concerted Refusals to Deal Under the Antitrust Laws,* 71 Harv.L.Rev. 1531 (1958). The term "group boycott" generally connotes "a refusal to deal or an inducement of others not to deal or to have business relations with tradesmen." Kalinowski, *supra,* 11 U.C.L.A.L.Rev. at 580 n. 49. *See also Worthen Bank & Trust Co. v. National BankAmericard Inc., supra,* 485 F.2d at 124–25.

The district court found that the Rozelle Rule operates to significantly deter clubs from negotiating with and signing free agents. By virtue of the Rozelle Rule, a club will sign a free agent only where it is able to reach an agreement with the player's former team as to compensation, or where it is willing to risk the awarding of unknown compensation by the Commissioner. The court concluded that the Rozelle Rule, as enforced, thus constituted a group boycott and a concerted refusal to deal, and was a *per se* violation of the Sherman Act.

There is substantial evidence in the record to support the district court's find-

**23.** In *Mandeville Farms v. Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), Mr. Justice Rutledge observed at 236, 68 S.Ct. at 1006:

> The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any

of these. *Cf. United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 [60 S.Ct. 811, 84 L.Ed. 1129]; *American Tobacco Co. v. United States,* 328 U.S. 781 [66 S.Ct. 1125, 90 L.Ed. 1575]. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.

ings as to the effects of the Rozelle Rule. We think, however, that this case presents unusual circumstances rendering it inappropriate to declare the Rozelle Rule illegal *per se* without undertaking an inquiry into the purported justifications for the Rule.

First, the line of cases which has given rise to *per se* illegality for the type of agreements involved here generally concerned agreements between business competitors in the traditional sense. *See generally Worthen Bank & Trust Co. v. National BankAmericard Inc., supra.* Here, however, as the owners and Commissioner urge, the NFL assumes *some* of the characteristics of a joint venture in that each member club has a stake in the success of the other teams. No one club is interested in driving another team out of business, since if the League fails, no one team can survive. *See United States v. National Football League,* 116 F.Supp. 319, 323 (E.D.Pa.1953). Although businessmen cannot wholly evade the antitrust laws by characterizing their operation as a joint venture,[24] we conclude that the unique nature of the business of professional football renders it inappropriate to mechanically apply per se illegality rules here, fashioned in a different context. This is particularly true where, as here, the alleged restraint does not completely eliminate competition for players' services. *Compare Kapp v. National Football League, supra with Smith v. Pro-Football, supra.* In similar circumstances, when faced with a unique or novel business situation, courts have eschewed a *per se* analysis in favor of an inquiry into the reasonableness of the restraint under the circumstances. *See White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738

(1963); *Worthen Bank & Trust Co. v. National BankAmericard Inc., supra.* In *White Motor,* the Supreme Court rejected the application of *per se* rules to vertically imposed territorial restrictions, stating:

> We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. They may be too dangerous to sanction or they may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business [citations omitted] and within the "rule of reason." We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack . . . any redeeming virtue" [citation omitted] and therefore should be classified as per se violations of the Sherman Act.

372 U.S. at 263, 83 S.Ct. at 702.

In *Worthen,* this court stated:

> The term "group boycott," as suggested above, is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the "group boycott" and "per se" labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed.

. . .

485 F.2d at 125.

*See also* Elman, *"Petrified Opinions" and Competitive Realities,* 66 Colum.L.Rev. 625 (1966).[25]

Second, one of the underpinnings of the *per se* analysis is the avoidance of lengthy and burdensome inquiries into the operation of the particular industry in question.[26]

---

**24.** *See Timken Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951).

**25.** In *Worthen Bank & Trust Co. v. National BankAmericard Inc.,* 485 F.2d 119 (8th Cir. 1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974), we reversed a grant of summary judgment based on a finding of a *per se* violation by a combination of banks operating a national bank credit card system. This court recognized the need of the banks to join together to produce the product being sold,

since it would be impossible for any of the member banks, acting alone, to issue a national bank credit card. Thus, we found, inferentially at least, a justification for preserving the integrity of that productive capacity.

**26.** The Supreme Court stated in *Northern Pac. R. Co. v. United States,* 356 U.S. 1 at 5, 78 S.Ct. 514 at 518, 2 L.Ed.2d 545 (1958):

> This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain

Here, the district court has already undertaken an exhaustive inquiry into the operation of the NFL and the effects of and justifications for the Rozelle Rule. Accordingly, the instant case lacks much of the basis for application of the *per se* doctrine.

In view of the foregoing, we think it more appropriate to test the validity of the Rozelle Rule under the Rule of Reason.

*Rule of Reason.*

█ The focus of an inquiry under the Rule of Reason is whether the restraint imposed is justified by legitimate business purposes, and is no more restrictive than necessary. *See Chicago Board of Trade v. United States, supra; Worthen Bank & Trust Co. v. National BankAmericard Inc., supra.*

In defining the restraint on competition for players' services, the district court found that the Rozelle Rule significantly deters clubs from negotiating with and signing free agents; that it acts as a substantial deterrent to players playing out their options and becoming free agents; that it significantly decreases players' bargaining power in contract negotiations; that players are thus denied the right to sell their services in a free and open market; that as a result, the salaries paid by each club are lower than if competitive bidding were allowed to prevail; and that absent

the Rozelle Rule, there would be increased movement in interstate commerce of players from one club to another.

We find substantial evidence in the record to support these findings. Witnesses for both sides testified that there would be increased player movement absent the Rozelle Rule. Two economists testified that elimination of the Rozelle Rule would lead to a substantial increase in player salaries. Carroll Rosenbloom, owner of the Los Angeles Rams, indicated that the Rams would have signed quite a few of the star players from other teams who had played out their options, absent the Rozelle Rule. Charles De Keado, an agent who represented Dick Gordon after he played out his option with the Chicago Bears, testified that the New Orleans Saints were interested in signing Gordon but did not do so because the Bears were demanding unreasonable compensation and the Saints were unwilling to risk an unknown award of compensation by the Commissioner.[27] Jim McFarland, an end who played out his option with the St. Louis Cardinals, testified that he had endeavored to join the Kansas City Chiefs but was unable to do so because of the compensation asked by the Cardinals. Hank Stram, then coach and general manager of the Chiefs, stated that he probably would have given McFarland an opportunity to make his squad had he not been required to give St. Louis anything in return.[28]

to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

27. Gordon himself testified that he was fined by the Chicago Bears for missing training camp and exhibition games even though he had played out his option with that club and was no longer under contract to them. His testimony reflected that Los Angeles called Chicago to get the Bears' consent to have Gordon work out with the Rams so that Los Angeles management could observe his performance. He further stated that he received indications from Cincinnati that Chicago's compensation requests were unreasonable; that "they (Chica-

go) were asking almost for their (Cincinnati's) entire defensive line." Gordon missed pre-season camp and the first few games of the 1972 season because of Chicago's unreasonable requests under the player compensation rule. He testified that this affected his physical condition and contributed to an injury that year.

28. Among other examples which support Judge Larson's findings are:

Marlin Briscoe indicated that he had to sign a three-year contract with Miami even though he would have preferred a single-year contract. He stated that "they would not accept anything less than a three-year contract because of what they would have to give up. . . ."

Alan Page testified that the Rozelle Rule was a hindrance to free player movement, but that the principal effect is on players' salaries.

Steven Falk, an attorney for Bob Hayes, testified that Dallas told the Redskins that "they

In support of their contention that the restraints effected by the Rozelle Rule are not unreasonable, the defendants asserted a number of justifications. First, they argued that without the Rozelle Rule, star players would flock to cities having natural advantages such as larger economic bases, winning teams, warmer climates, and greater media opportunities; that competitive balance throughout the League would thus be destroyed; and that the destruction of competitive balance would ultimately lead to diminished spectator interest, franchise failures, and perhaps the demise of the NFL, at least as it operates today. Second, the defendants contended that the Rozelle Rule is necessary to protect the clubs' investment in scouting expenses and player developments costs. Third, they asserted that players must work together for a substantial period of time in order to function effectively as a team; that elimination of the Rozelle Rule would lead to increased player movement and a concomitant reduction in player continuity; and that the quality of play in the NFL would thus suffer, leading to reduced spectator interest, and financial detriment both to the clubs and the players. Conflicting evidence was adduced at trial by both sides with respect to the validity of these asserted justifications.

The district court held the defendants' asserted justifications unavailing. As to the clubs' investment in player development costs, Judge Larson found that these expenses are similar to those incurred by other businesses, and that there is no right to compensation for this type of investment. With respect to player continuity, the court found that elimination of the Rozelle Rule would affect all teams equally in that regard; that it would not lead to a reduction in the quality of play; and that even assuming that it would, that fact would not justify the Rozelle Rule's anticompetitive effects. As to competitive balance and the consequences which would flow from abolition of the Rozelle Rule, Judge Larson

found that the existence of the Rozelle Rule has had no material effect on competitive balance in the NFL. Even assuming that the Rule did foster competitive balance, the court found that there were other legal means available to achieve that end—e. g., the competition committee, multiple year contracts, and special incentives. The court further concluded that elimination of the Rozelle Rule would have no significant disruptive effects, either immediate or long term, on professional football. In conclusion the court held that the Rozelle Rule was unreasonable in that it was overly broad, unlimited in duration, unaccompanied by procedural safeguards, and employed in conjunction with other anticompetitive practices such as the draft, Standard Player Contract, option clause, and the no-tampering rules.[29]

We agree that the asserted need to recoup player development costs cannot justify the restraints of the Rozelle Rule. That expense is an ordinary cost of doing business and is not peculiar to professional football. Moreover, because of its unlimited duration, the Rozelle Rule is far more restrictive than necessary to fulfill that need.

We agree, in view of the evidence adduced at trial with respect to existing players turnover by way of trades, retirements and new players entering the League, that the club owners' arguments respecting player continuity cannot justify the Rozelle Rule. We concur in the district court's conclusion that the possibility of resulting decline in the quality of play would not justify the Rozelle Rule. We do recognize, as did the district court, that the NFL has a strong and unique interest in maintaining competitive balance among its teams. The key issue is thus whether the Rozelle Rule is essential to the maintenance of competitive balance, and is no more restrictive than necessary. The district court

---

(Dallas) were not trading Hayes to anybody within their own division. . . ."

William Sullivan president of the Patriots, said he didn't want to sign Joe Kapp, Minnesota's quarterback, and then take a chance on what Minnesota would demand.

**29.** See note 6, *supra*.

answered both of these questions in the negative.[30]

We need not decide whether a system of inter-team compensation for free agents moving to other teams is essential to the maintenance of competitive balance in the NFL. Even if it is, we agree with the district court's conclusion that the Rozelle Rule is significantly more restrictive than necessary to serve any legitimate purposes it might have in this regard. First, little concern was manifested at trial over the free movement of average or below average players. Only the movement of the better players was urged as being detrimental to football. Yet the Rozelle Rule applies to every NFL player regardless of his status or ability. Second, the Rozelle Rule is unlimited in duration. It operates as a perpetual restriction on a player's ability to sell his services in an open market throughout his career. Third, the enforcement of the Rozelle Rule is unaccompanied by procedural safeguards. A player has no input into the process by which fair compensation is determined. Moreover, the player may be unaware of the precise compensation demanded by his former team, and that other teams might be interested in him but for the degree of compensation sought.[31]

Judge Frank emphasized the harshness of a rule in the field of professional baseball similar to the Rozelle Rule:

As one court, perhaps a bit exaggeratedly, has put it, "While the services of these baseball players are ostensibly secured by voluntary contracts a study of the system as * * * practiced under the plan of the National Agreement, reveals the involuntary character of the servitude which is imposed upon players by the strength of the combination controlling the labor of practically all of the players in the country. * * * " [I]f the players be regarded as quasi-peons, it is of no moment that they are well paid; only the totalitarian-minded will believe that high pay excuses virtual slavery.

*Gardella v. Chandler*, 172 F.2d 402, 410 (2nd Cir. 1949).[32]

In sum, we hold that the Rozelle Rule, as enforced, unreasonably restrains trade in violation of § 1 of the Sherman Act.

## OTHER CONTENTIONS.

Defendants finally contend that the district court erred in finding that the plaintiffs were injured in their business or property; that the court failed to make certain findings required by the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*; and that there is no basis for a finding of liability as to defendants Rozelle and the NFL. We find no merit to these contentions.

In view of our prior discussions with respect to the effect of the Rozelle

---

**30.** Appellants contend that the district court's findings of fact in this regard are too conclusory and do not address a variety of questions pertinent to the issue of whether the Rozelle Rule is necessary to maintain competitive balance. We perceive no merit to this contention. The additional findings deemed necessary by appellants are largely subsidiary and redundant. The court's findings are sufficient to disclose the basis for its decision. *See* 5A *Moore's Federal Practice* ¶ 52.06[1], at 2710 (2d ed. 1975).

**31.** The conclusion that the Rozelle Rule constitutes an unreasonable restraint of trade was reached in *Kapp v. National Football League, supra,* even without the prolonged inquiry which has been undertaken in this case. The court stated:

We conclude that such a rule imposing restraint virtually unlimited in time and extent, goes far beyond any possible need for fair

protection of the interests of the club-employers or the purposes of the NFL and that it imposes upon the player-employees such undue hardship as to be an unreasonable restraint and such a rule is not susceptible of different inferences concerning its reasonableness; it is unreasonable under any legal test and there is no genuine issue about it to require or justify trial.

390 F.Supp. at 82.

**32.** Judge Learned Hand stated, in the same case:

[W]hatever other conduct the Acts may forbid, they certainly forbid all restraints of trade which were unlawful at common-law, and one of the oldest and best established of these is a contract which unreasonably forbids any one to practice his calling.

*Gardella v. Chandler*, 172 F.2d 402, 408 (2d Cir. 1949).

Rule upon player movement and salaries, we find ample evidence to support the district court's findings that plaintiffs have been injured in their business or property.

■ Regarding appellants' second contention, the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, requires that certain specific findings of fact be entered prior to the granting of injunctive relief in cases arising out of a labor dispute within the meaning of 29 U.S.C. § 113(a). It is not clear that the instant controversy constitutes such a labor dispute. In any event, we find that the district court made the required findings of fact.

■ Finally, we perceive no error in the district court's finding of liability as to the defendants Rozelle and the NFL. Evidence was adduced at trial tending to show that the manner in which Rozelle, as Commissioner of the NFL, had exercised his authority to award compensation under the Rozelle Rule has significantly contributed to the restrictive impact of the Rule. We note also that no damages have as yet been assessed against Rozelle and the NFL, trial as to that issue having been deferred pending disposition of this appeal.

CONCLUSION.

In conclusion, although we find that non-labor parties may potentially avail themselves of the nonstatutory labor exemption where they are parties to collective bargaining agreements pertaining to mandatory subjects of bargaining, the exemption cannot be invoked where, as here, the agreement was not the product of bona fide arm's-length negotiations. Thus, the defendants' enforcement of the Rozelle Rule is not exempt from the coverage of the antitrust laws. Although we disagree with the district court's determination that the Rozelle Rule is a *per se* violation of the antitrust laws, we do find that the Rule, as implemented, contravenes the Rule of Reason and thus constitutes an unreasonable restraint of trade in violation of § 1 of the Sherman Act.

We note that our disposition of the antitrust issue does not mean that every restraint on competition for players' services would necessarily violate the antitrust laws. Also, since the Rozelle Rule, as implemented, concerns a mandatory subject of collective bargaining, any agreement as to interteam compensation for free agents moving to other teams, reached through good faith collective bargaining, might very well be immune from antitrust liability under the nonstatutory labor exemption.

It may be that some reasonable restrictions relating to player transfers are necessary for the successful operation of the NFL. The protection of mutual interests of both the players and the clubs may indeed require this. We encourage the parties to resolve this question through collective bargaining. The parties are far better situated to agreeably resolve what rules governing player transfers are best suited for their mutual interests than are the courts. *See Kansas City Royals v. Major League Baseball Players*, 532 F.2d 615, 632 (8th Cir. 1976). However, no mutual resolution of this issue appears within the present record. Therefore, the Rozelle Rule, as it is presently implemented, must be set aside as an unreasonable restraint of trade.

With the exception of the district court's finding that implementation of the Rozelle Rule constitutes a *per se* violation of § 1 of the Sherman Act and except as it is otherwise modified herein, the judgment of the district court is AFFIRMED. The cause is remanded to the district court for further proceedings consistent with this opinion.