PHOENIX ELECTRIC COMPANY, an Oregon corporation, et al., Plaintiffs,

v.

NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC., et al., Defendants.

NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, INC., Counterclaim Plaintiff,

v.

ASSOCIATED BUILDERS AND CONTRACTORS, INC., Counterclaim Defendant.

Civ. No. 91–436–JE.

United States District Court, D. Oregon.

May 9, 1994.

Thomas M. Triplett, Schwabe, Williamson & Wyatt, Portland, OR, for plaintiffs.

Jack L. Kennedy, Kennedy, King & Zimmer, Portland, OR, for defendant National Elec. Contractors Ass'n, Inc.

Wayne Hilliard, Milo Petranovich, Richard N. Van Cleave, Lane Powell Spears Lubersky, Portland, OR, for defendants Oregon–Columbia Chapter of NECA, Atlas Elec. Contractors, Inc., and Oregon Elec. Const., Inc.

Paul C. Hays, James W. Kasameyer, Carney, Buckley, Kasameyer & Hays, Portland, OR, for defendant International Broth. of Elec. Workers Local 48.

## ORDER

FRYE, District Judge:

The court has reviewed *de novo* those portions of the Findings and Recommendation filed February 24, 1994 to which objections have been filed (# 226) and (# 227).

The court adopts the Findings and Recommendation from page 1 through page 24, line

14, except the sentence at page 4, lines 8 through 11. The court does not adopt the Findings and Recommendation from page 24, line 15 through page 38, line 19.

IT IS HEREBY ORDERED that:

(1) the motion of plaintiff Associated Builders and Contractors, Inc. for partial summary judgment on its second antitrust claim (# 169) is DENIED;

(2) the motion of plaintiff Associated Builders and Contractors, Inc. for summary judgment on the counterclaims of defendant National Electrical Contractors Association, Inc. (# 174) is GRANTED;

(3) the motion of defendant National Electrical Contractors Association, Inc. for summary judgment on the claims of the plaintiffs (# 177) is GRANTED; and

(4) the motion of defendants Oregon–Columbia Chapter of the National Electrical Contractors Association, Inc., Atlas Electrical Contractors, Inc., Oregon Electrical Construction, Inc., and the International Brotherhood of Electrical Workers Local 48 for summary judgment as to the claims of the plaintiffs (# 182) is GRANTED.

## OPINION

The matters before the court are (1) the objections of the plaintiffs (# 227); and (2) the objections of defendant National Electrical Contractors Association, Inc. (# 226) to the Findings and Recommendation of the Honorable John Jelderks, United States Magistrate Judge, dated February 24, 1994.

The plaintiffs bring this action for alleged violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, challenging the Market Recovery Program of defendant International Brotherhood of Electrical Workers Local 48 (Local 48). The Market Recovery Program was proposed by Local 48 during the collective bargaining negotiations between Local 48 and the Oregon–Columbia Chapter of the National Electrical Contractors Association, Inc. On April 6, 1986, these parties formally executed the Market Recovery Program as an amendment to the collective bargaining agreement.

Under the Market Recovery Program, union members contribute a percentage of their union dues to a fund used to assist employers who utilize union labor on certain targeted projects.

### Counterclaims for Defamation

Initially, in his Findings and Recommendation, Magistrate Judge Jelderks concludes at page 8, line 18 through page 14, line 19 that the court should grant summary judgment for the plaintiffs and against the National Electrical Contractors Association, Inc. on the two counterclaims of the National Electrical Contractors Association, Inc. for defamation and should enter judgment in favor of the Associated Builders and Contractors, Inc. on these counterclaims. Magistrate Judge Jelderks concludes that the alleged defamatory statements are insufficient to support a finding by a trier of fact that the Associated Builders and Contractors, Inc. acted with actual malice.

No objections have been timely filed to this portion of the Findings and Recommendation. Since no objections have been filed, this relieves this court of any obligation to give the factual findings *de novo* review. *Britt v. Simi Valley Unified School Dist.,* 708 F.2d 452, 454 (9th Cir.1983). Having reviewed the legal principles *de novo,* the court finds no error. Accordingly, this court adopts the findings of Magistrate Judge Jelderks and his recommendation at page 8, line 18 through page 14, line 19 that this court grant summary judgment against the National Electrical Contractors Association, Inc. on its two counterclaims for defamation and enter judgment in favor of the Associated Builders and Contractors, Inc. on these two counterclaims.

### Exemptions to the Plaintiffs' Antitrust Claims

In the remaining portions of his Findings and Recommendation, Magistrate Judge Jelderks considers the merits of the antitrust claims brought by the plaintiffs against the defendants.

In his Findings and Recommendation at page 14, line 20 through page 24, line 14,

Magistrate Judge Jelderks considered the arguments of the defendants that they are entitled to summary judgment on the claims of the plaintiffs for antitrust violations on the grounds that statutory and non-statutory exemptions applicable to certain labor activities preclude liability under the facts of this case. Magistrate Judge Jelderks concludes that both the statutory and non-statutory exemptions apply under the facts of this case, and that the defendants are entitled to summary judgment based upon the labor exemption from antitrust liability.

The plaintiffs contend that summary judgment in favor of the defendants is not proper. The plaintiffs argue that Magistrate Judge Jelderks improperly found that the Market Recovery Program is a wage concession and that the issue of whether the Market Recovery Program is a wage concession or an anticompetitive subsidy is a disputed question of fact for the jury to determine.

The plaintiffs further argue that, contrary to the findings of Magistrate Judge Jelderks, the statutory exemption from the antitrust laws does not apply to these defendants because the Market Recovery Program is a product of a combination between a union and a non-labor group and does not serve the legitimate self-interest of the union.

In addition, the plaintiffs argue that Magistrate Judge Jelderks improperly analyzed the applicability of the non-statutory exemption.

The defendants respond that Magistrate Judge Jelderks properly considered the undisputed facts and to those facts applied the correct law.

■ When either party objects to any portion of a magistrate's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the magistrate's report. 28 U.S.C. § 636(b)(1); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). The matter is before this court pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b).

This court has, therefore, reviewed *de novo* the rulings of Magistrate Judge Jelderks.

The court finds that there is no dispute as to the material facts in this case. While the legal conclusions that each of the parties draws from the undisputed facts differ, the material facts which relate to whether the exemption from antitrust liability is applicable are not in dispute.

The court has reviewed with care the undisputed facts and the applicable legal principles, and upon so doing adopts the Findings and Recommendations of Magistrate Judge Jelderks at page 14, line 20 through page 24, line 14. The defendants are entitled to summary judgment on the antitrust claims filed against them by the plaintiffs because statutory and non-statutory exemptions applicable to certain labor activities preclude their liability under the undisputed facts of this case.

### Merits of the Antitrust Claims

■ On page 24, line 15 through page 38, line 19, Magistrate Judge Jelderks addresses the merits of the antitrust claims filed by the plaintiffs and concludes that these claims fail on the merits. Magistrate Judge Jelderks recognizes that a finding that the defendants are entitled to summary judgment on the labor exemption from the antitrust liability makes it unnecessary for the court to address the contentions of the defendants that the antitrust claims must fail on the merits but analyzes the merits in order to have a complete record.

This court declines to adopt this portion of the Findings and Recommendation of Magistrate Judge Jelderks on the grounds that the Findings and Recommendation adopted by this court renders moot these issues.

### The Objections of the National Electrical Contractors Association, Inc.

The National Electrical Contractors Association, Inc. objects to a sentence in the background portion of the Findings and Recommendation at page 4, which states: "Defendant National NECA, a trade association of electrical contractors, negotiates and administers collective bargaining agreements on behalf of electrical contractors with Local IBEW unions." The National Electrical Contractors Association, Inc. contends that

this statement of fact has no impact on the recommendation and that the statement is factually inaccurate.

In addition, the National Electrical Contractors Association, Inc. argues that this court should not adopt that portion of the Findings and Recommendation at page 38, line 3 through page 38, line 19 in which Magistrate Judge Jelderks concludes that material issues of fact remain concerning questions of agency and the extent to which the National Electrical Contractors Association, Inc. might otherwise share responsibility for the policies at issue.

The plaintiffs contend that Magistrate Judge Jelderks correctly concludes that there are disputed issues of material fact as to the role of the National Electrical Contractors Association, Inc.

Magistrate Judge Jelderks concludes that the National Electrical Contractors Association, Inc. is entitled to an order of summary judgment in its favor on the claims of the plaintiffs in this case. Magistrate Judge Jelderks recognizes that the issues raised by the claims of the plaintiffs do not need to be reached. This court declines to adopt the portion of the Findings and Recommendation at page 38, line 3 through page 38, line 19. The court finds that this issue is moot in light of the court's previous ruling and will not adopt the statement at page 4 from the background section on the grounds that it is not material to the resolution reached and the plaintiffs have not opposed this portion of the objection.

## CONCLUSION

The court has reviewed *de novo* those portions of the Findings and Recommendation filed February 24, 1994 to which objections have been filed (# 226) and (# 227).

 The court adopts the Findings and Recommendation from page 1 through page 24, line 14, except the sentence at page 4, lines 8 through 11. The court does not adopt the Findings and Recommendation from page 24, line 15 through page 38, line 19.

The court rules as follows:

(1) The motion of plaintiff Associated Builders and Contractors, Inc. for partial summary judgment on its second antitrust claim (# 169) is denied.

(2) The motion of plaintiff Associated Builders and Contractors, Inc. for summary judgment on the counterclaims of defendant National Electrical Contractors Association, Inc. (# 174) is granted.

(3) The motion of defendant National Electrical Contractors Association, Inc. for summary judgment on the claims of the plaintiffs (# 177) is granted.

(4) The motion of defendants Oregon–Columbia Chapter of the National Electrical Contractors Association, Inc., Atlas Electrical Contractors, Inc., Oregon Electrical Construction, Inc., and the International Brotherhood of Electrical Workers Local 48 for summary judgment as to the claims of the plaintiffs (# 182) is granted.

## FINDINGS AND RECOMMENDATION

JELDERKS, United States Magistrate Judge:

Plaintiffs Associated Builders and Contractors, Inc. (ABC), Phoenix Electric Company (Phoenix), and New Tech Electric (New Tech) bring this antitrust action against defendants National Electrical Contractors Association (National NECA), the Oregon–Columbia Chapter of NECA (Oregon NECA), Atlas Electrical Contractors, Inc. (Atlas), Oregon Electrical Construction, Inc. (Oregon Electric) and Local 48 of the International Brotherhood of Electrical Workers (Local 48). Defendant National NECA asserts two counterclaims for defamation against plaintiff ABC.

Before the court are plaintiff ABC's motion for partial summary judgment as to its second antitrust claim, plaintiff ABC's motion for summary judgment on defendant National NECA's counterclaims, defendant National NECA's motion for summary judgment on plaintiffs' claims, and defendants Oregon NECA and Local 48's motion for summary judgment on plaintiffs' claims.

These motions should be granted in part and denied in part. Plaintiff ABC's motion

for partial summary judgment on its second antitrust claim should be denied, and its motion for summary judgment on defendant National NECA's counterclaims should be granted. Defendant National NECA's motion for summary judgment on plaintiffs' claims should be granted. Defendants Oregon NECA and Local 48's motion for summary judgment on plaintiffs' claims should be granted. Adoption of these recommendations will fully resolve all issues pending in this action.

## BACKGROUND

Plaintiff ABC is a trade association whose members are engaged in the construction industry. Plaintiffs Phoenix and New Tech are nonunion ABC members operating as electrical construction contractors in Oregon.

Defendant National NECA, a trade association of electrical contractors, negotiates and administers collective bargaining agreements on behalf of electrical contractors with local IBEW unions. It charters local chapters such as Oregon NECA throughout the United States.

Oregon NECA, a local chapter of National NECA, is a trade association made up of electrical contractors in Western Oregon and Washington State. Oregon NECA has an ongoing collective bargaining relationship with Local 48, and serves as the collective bargaining representative for its members as well as for certain nonmember electrical contractors. Oregon NECA and Local 48 have negotiated separate collective bargaining agreements covering commercial/industrial and residential construction work.

Atlas and Oregon Electric, members of Oregon NECA operating in Western Oregon, have signed labor agreements with Local 48.

### 1. *Plaintiffs' Claims*

In this action, plaintiffs challenge Local 48's "Market Recovery Program" (MRP), otherwise referred to as the Oregon Job Targeting Program (OJTP). Under the OJTP, unions use various methods to improve their members' ability to secure work. As part of this effort, union members contribute a percentage of their dues to a fund used to assist employers using union labor on certain targeted projects. The unions sometimes inform union contractors that, on a particular job, the job targeting fund will be available to effectively reduce the standard hourly wages normally paid to union laborers. In other targeted jobs, the fund will reimburse the employer for a portion of the union scale wages after the employer pays the union workers at the collectively-bargained rate.

Plaintiffs characterize the OJTP as a conspiracy to "exclude from commercial/industrial electrical construction industry in the metropolitan Portland area, a relevant market under the antitrust [laws], nonunion electrical construction companies, including plaintiffs." They allege that the OJTP is used to identify nonunion contractors who are expected to bid on given projects, and to specify the number of hours of electrical work to be performed. Plaintiffs add that selection of targeted projects is based "upon the identity of the nonunion bidder and/or the nature of the project in order to obtain maximum exclusionary effect."

Plaintiffs allege that defendants' job targeting program allows members of Oregon NECA to bid for jobs against nonunion firms at "predatory prices ... explicable only by an intent to discipline or eliminate nonunion competition from the market." They contend that the subsidized bids submitted by Oregon NECA members are so low that

(1) The benefit of the bids is dependent upon their tendency to discipline or eliminate competition and thereby to enhance long-term ability to reap the benefits of monopoly power;

(2) Absent the subsidy, the bids would generally be below total costs; and/or

(3) Absent the subsidy, in selective cases, the bids are below variable costs of the bidders.

As other evidence of defendants' "specific intent" to exclude nonunion firms from the electrical contracting market plaintiffs cite "threats" to general contractors using nonunion contractors, agreements with owners and developers to use only union labor on projects, and agreements with Taft–Hartley

Trusts to invest funds in projects on the condition that nonunion contractors be excluded.

Plaintiffs allege that the OJTP has allowed members of Oregon NECA to increase their market share of the "commercial/industrial electrical construction projects in the Portland metropolitan area" from 30–40% to more than 70%. They add that, by the end of the fourth quarter of 1990, the OJTP "was successful in procuring 68% of the targeted jobs; and had been used on more than 4,000 jobs; and has secured projects in excess of $90,000,000." Plaintiffs contend that their costs are lower than those of Oregon NECA members, both because they have lower labor costs, and because they use their labor more efficiently than do union contractors. They add that the OJTP has substantially weakened the financial position of nonunion contractors, threatened to drive them from the market, and deterred nonunion contractors from bidding on some projects. Plaintiffs contend that prices for electrical labor will rise to "supra-competitive" levels once efficient nonunion contractors have been driven from the market.

Plaintiffs bring claims for alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. In the first claim, alleging violation of 15 U.S.C. § 1, plaintiffs assert that low bids by defendant union contractors reflect "an intention to create entry barriers and to discipline or eliminate competition from non-union firms and thereby enhance the long-term ability of members of Oregon NECA to raise prices above competitive levels." They characterize defendants' prices as predatory, and contend that, in the long run, these prices will drive competition from the market. After nonunion competition has been eliminated, they assert, the threat of renewed subsidies will prevent other would-be competitors from entering the market.

Plaintiffs' second claim alleges violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In this claim, plaintiffs allege that the OJTP "constitutes a combination or conspiracy to monopolize the market" by excluding non-Oregon NECA members from the market. As overt acts in furtherance of the "combination or conspiracy," plaintiffs cite "the exchange of information on projects selected for job targeting and the exchange of competitively-sensitive information by members of Oregon NECA." They further allege that the OJTP "was undertaken, and is carried out, with a specific intent ... to monopolize the market" for commercial/industrial electrical construction business in the Portland metropolitan area.

Plaintiffs seek recovery of treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15. They also seek an injunction "restraining violations by defendants of the antitrust laws of the United States" as described in the complaint.

### 2. National NECA's Counterclaims

National NECA's answer includes two counterclaims for defamation against ABC. The first counterclaim alleges that ABC issued a defamatory press release concerning this action on May 14, 1991, in the District of Columbia. National NECA asserts that the following statements concerning it in that press release were defamatory:

(a) "NECA ... violated the Sherman–Clayton Antitrust Act by conspiring to exclude open shop contractors from Oregon's electrical construction market."

(b) "... the defendants are restraining trade and violating antitrust laws."

(c) "But NECA itself has taken an active role in the conspiracy."

(d) "NECA has ... encouraged or directed its members to participate in unlawful job targeting conspiracies, both in Oregon and elsewhere in the country."

National NECA alleges that plaintiff ABC made these statements with knowledge of their falsity or with reckless disregard of their truth. In the alternative, National NECA alleges that the statements were made "in negligent disregard for their truth or falsity." National NECA adds that the statements "were made maliciously, in bad faith, and without privilege," and with the "actual intent to defame National NECA."

The second counterclaim alleges that ABC published an article concerning this litigation, including the same statements as are cited in its first counterclaim, in its newsletter. This

counterclaim asserts that the statements at issue "implied illegal conduct by National NECA," and are actionable *per se.*

## STANDARDS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case. *Id.* When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1985). No genuine issue for trial exists however, where the record as a whole could not lead the trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## DISCUSSION

I. *Plaintiff ABC's Motion for Summary Judgment on Defendant National NECA's Counterclaims*

Plaintiff ABC earlier moved to dismiss National NECA's counterclaims for lack of jur-

isdiction and for failure to state a claim upon which relief could be granted. In the alternative, it sought summary judgment on these claims. I recommended that those motions be denied. *Tigard Elec., et al. v. National Elec. Contractors Ass'n, Inc., et al.,* 790 F.Supp. 1498, 1504–05 (D.Or.1992). I based my recommendation on the existence of several discrepancies between the complaint and the allegedly defamatory statements, and the submission of materials demonstrating that National NECA and ABC have been engaged in a struggle over the legality of the job targeting program for some time. I concluded that a single affidavit denying malice was insufficient to support granting a motion for summary judgment in the face of the opposing submissions, and that material issues of fact remained concerning privilege defenses and malice.[1] *Id.* at 1505.

National NECA contends that my earlier recommendation to deny the motion against its counterclaims renders the present motion against those claims an inappropriate "second bite at the apple," and that it should be awarded costs and attorneys' fees for "opposing the same motion for a second time." I disagree. My earlier recommendation was made before the parties had conducted significant discovery. ABC's present motion is based upon the much more thorough factual record now before the court. Having reviewed that record, I conclude that plaintiff ABC is entitled to summary judgment on National NECA's counterclaims.

Plaintiff ABC contends that it is entitled to summary judgment on the counterclaims because National NECA cannot establish that it acted with actual malice, and because ABC's statements were privileged as a fair and accurate report of its complaint. Because I agree with the former proposition, I need not reach the latter.

To prevail on a defamation claim, a public official or public figure[2] must estab-

---

1. The parties agree that the defamation laws of the District of Columbia apply to this action. *Tigard Elec.,* 790 F.Supp. at 1505, n. 3.

2. A plaintiff's status as a public figure is a question of law for the court. *Tavoulareas v. Piro,* 817 F.2d 762, 772 (D.C.Cir.), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987).

lish that the defendant published false statements with "actual malice." *See, Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342–46, 94 S.Ct. 2997, 3008–10, 41 L.Ed.2d 789 (1974). "Actual malice" is defined as making statements with knowledge, or reckless disregard, of their falsity. *New York Times v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). Only statements made with a high degree of awareness of their probable falsity are made with actual malice. *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215–16, 13 L.Ed.2d 125 (1964).

▬ A finding that a defendant made defamatory statements with actual malice must be supported by sufficient evidence that the defendant "entertained serious doubt as to the truth of [the] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Proof sufficient to satisfy this difficult standard will usually consist of evidence that the story in question was either (1) "fabricated"; (2) "so inherently improbable that only a reckless man would have put [it] in circulation"; or (3) "based wholly on an unverified anonymous telephone call" or some other source that the defendant had "obvious reasons to doubt." *Id.* at 732, 88 S.Ct. at 1326.

▬ Defendant NECA has not shown evidence from which a trier of fact could conclude that ABC acted with actual malice in publishing the statements at issue. Plaintiff ABC has shown evidence that it had ample reason to believe that National NECA was directly involved with job targeting programs in Oregon and elsewhere in the United States, and that it encouraged and assisted its members' participation in these programs. National NECA therefore cannot establish that statements concerning its role in the alleged conspiracy were made with actual malice.

National NECA likewise has not shown sufficient evidence to allow a trier of fact to conclude that ABC's statements concerning the alleged unlawful nature of its job targeting activities were made with actual malice. My conclusion that the OJTP does not violate antitrust laws does not come close to establishing that ABC's statements concerning job targeting programs were made with actual malice. ABC's assertions that job targeting programs violate antitrust law are supported by the legal opinion of competent counsel. They are in no way based upon the kind of fabrication, obviously inherent improbability, or reliance upon obviously dubious sources generally required to establish actual malice.

That some of the allegedly defamatory statements go beyond the precise allegations of ABC's complaint is not significant. The statements at issue substantially reiterate key allegations of the complaint. The relatively minor differences between the complaint, which is supported by legal opinion, and the published statements, are insufficient to support the conclusion that ABC acted with actual malice.

ABC's motion for summary judgment on National NECA's counterclaims should be granted.

II. *National NECA's, Oregon NECA's, and IBEW 48's Motions for Summary Judgment on Plaintiffs' Claims*

As noted above, plaintiffs allege that defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Section 1 prohibits contracts, combinations, and conspiracies in restraint of trade. Section 2 prohibits monopolization and attempted monopolization.

Defendants contend that they are entitled to summary judgment on plaintiffs' claims

---

A party may be an "all purpose" public figure, or may be accorded that status as to a particular issue of public concern. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 n. 3, 106 S.Ct. 2505, 2509 n. 3, 91 L.Ed.2d 202 (1986).

In response to a request for admissions, National NECA stated that it "may be a limited public figure in the electrical construction industry for some purposes...." In its opposition to ABC's motion for summary judgment on the

counterclaims, National NECA notes that it "does not contest that it is required to prove that ABC made its defamatory statements with actual malice." Even in the absence of that concession, I would conclude that the job targeting issue presented in this action is a matter of public interest, and that defendant National NECA is a public figure for the purposes of the statements at issue here.

because statutory and nonstatutory exemptions applicable to certain labor activities preclude liability under the facts at issue here, and because plaintiffs' antitrust claims fail upon other grounds as well. Defendant National NECA also contends that it is entitled to summary judgment on plaintiffs' claims because it cannot be held vicariously liable for the acts of Oregon NECA, and because there is no evidence that it had a "conscious commitment" to the alleged predatory pricing scheme.

### A. Statutory and Non–Statutory Labor Exemption

#### 1. Statutory Exemption

Congress has exempted a number of labor activities from antitrust liability. Under Section 6 of the Clayton Act, 15 U.S.C. § 17,

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations, constituted for the purposes of mutual help ... or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

Section 20 of the Clayton Act, 29 U.S.C. § 52, likewise prohibits injunctions of certain work-related activities. In addition, the Norris–LaGuardia Anti–Injunction Act, 29 U.S.C. § 101 et seq., and the Wagner Act, 29 U.S.C. § 157 et seq., prohibit labor injunctions as a means to enforce antitrust laws, and establish organized labor's collective bargaining rights.

The labor antitrust exemption is not boundless, and several Supreme Court decisions have interpreted its scope. In Apex Hosiery Co. v. Leader, 310 U.S. 469, 504 n. 24, 60 S.Ct. 982, 998 n. 24, 84 L.Ed. 1311 (1940), the Court observed that enactment of the labor exemption statutes "clearly recognizes that combinations of workers eliminating competition among themselves and restricting competition ... based on wage cutting are not contrary to public policy."

In United States v. Hutcheson, 312 U.S. 219, 231, 61 S.Ct. 463, 465–66, 85 L.Ed. 788 (1941), the Court noted that courts are required to consider the policies underlying the Clayton Act, the Norris–LaGuardia Act, and the Sherman Act. The Court concluded that the labor exemption applies "[s]o long as a union acts in its self-interest and does not combine with non-labor groups." Id. at 232, 61 S.Ct. at 466.

In Allen Bradley Co. v. Local 3, IBEW, 325 U.S. 797, 809, 65 S.Ct. 1533, 1539–40, 89 L.Ed. 1939 (1945), the Court held unlawful an agreement between a union and local manufacturers and contractors to prohibit the purchase of products not manufactured locally.

In ·United Mine Workers v. Pennington, 381 U.S. 657, 664, 85 S.Ct. 1585, 1590–91, 14 L.Ed.2d 626 (1965) the Court observed that a union could lawfully attempt to unilaterally impose the same wage rate upon all employers because the Sherman Act did not intend to restrict attempts to eliminate wage competition. The Court concluded, however, that the exemption does not apply where unions agree with non-labor entities to eliminate competitors from the market. Id. at 665–666, 85 S.Ct. at 1590–91.

In Connell Constr. Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 625, 95 S.Ct. 1830, 1836, 44 L.Ed.2d 418 (1975), the Court concluded that the statutory labor exemption does not apply where a union imposed an agreement requiring a general contractor to subcontract only with companies that had signed agreements with the union. The Court noted, however, that the nonstatutory exemption reflected a labor policy favoring labor organization "to eliminate competition over wages and working conditions." Id. at 622, 95 S.Ct. at 1835. The court added that it had acknowledged "that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions." Id.

 Based upon my review of the applicable Supreme Court cases, I conclude that the appropriate standard for analyzing the statutory exemption is that set out in Hutcheson, 312 U.S. at 232, 61 S.Ct. at 466.

As noted above, under that test, the statutory exemption to antitrust scrutiny applies "[s]o long as a union acts in its self-interest and does not combine with non-labor groups." Plaintiffs correctly observe that this is a two-part test, and that the exemption applies only where both parts are satisfied. *See H.A. Artists & Assoc. v. Actors' Equity Ass'n,* 451 U.S. 704, 715, 101 S.Ct. 2102, 2109, 68 L.Ed.2d 558 (1981). The record submitted in support of and opposition to the parties' cross-motions for summary judgment leaves no doubt that the OJTP has been established and maintained to further the union's legitimate self interest. From that record, it is clear that the union members were losing work to non-union workers in the electrical field during the early 1980s, and that the OJTP was designed to allow union workers to obtain more work by enabling union contractors to compete with non-union contractors more effectively. It is likewise clear that this attempt to strengthen the position of organized workers is consistent with the public policy reflected in the statutory exemption.

That the second part of the *Hutcheson* test is satisfied here is perhaps less obvious. A thorough review of the record, however, establishes that, in carrying out the OJTP, the union does not "combine" with non-labor groups, the members of Oregon NECA, in the manner proscribed in *Hutcheson.* The parties vigorously dispute the proper characterization of the OJTP. It can fairly be described, however, not as a wage subsidy, but as a negotiated wage concession which Local 48 and the members of Oregon NECA agree will be available in particular instances. Under this program, union workers contribute 3.5% of their wages to a fund that can then be used to reduce the amount that union contractors must pay in wages to union workers on specific projects. Under the OJTP, unions are not "combining" with non-labor groups in ways Courts have condemned as outside the statutory labor exemption: They are not agreeing with union contractors to limit who can bid on given projects, or on any other terms or conditions applicable to the provision of services. Instead, stated simply, the union workers in question have agreed to work for less than the hourly rates

negotiated in the collective bargaining agreement. Any collective bargaining agreement between Local 48 and union contractors generally lowering wages paid to union workers would clearly allow union contractors to compete more effectively with non-union contractors. Any such agreement clearly would not, simply because it was the product of an agreement, be considered a "combination" outside the scope of the statutory exemption. The fact that the OJTP allows union contractors to incur lower labor costs on *particular* targeted jobs does not alter the analysis or remove that activity from the statutory labor exemption.

Though the OJTP is clearly the primary issue in this action, as noted above, plaintiffs also cite "threats" to general contractors who engage nonunion subcontractors, agreements with owners and developers to use only union labor on projects, and agreements with Taft–Hartley Trusts to invest funds in projects on the condition that nonunion contractors be excluded. In opposing defendants' motion for summary judgment on the basis of the labor exemption, plaintiffs assert that legitimate union activity does not include "acts of secondary pressure and/or threats, even if undertaken to achieve a legitimate end." Plaintiffs have not produced sufficient evidence to support their position, and defendants are entitled to summary judgment on these assertions as well. A trier of fact could not reasonably conclude that the employer defendants participated in the activities alleged. Under the Norris–LaGuardia Act and Section 20 of the Clayton Act, unions are allowed to engage in peaceful secondary activity without violating antitrust laws. Plaintiffs have not shown evidence that defendants engaged in secondary activity that was not protected or entered into unlawful combinations with plaintiffs' competitors.

### 2. *Non-statutory Exemption*

In addition to the statutory exemption enacted by Congress, courts have recognized a non-statutory labor exemption to antitrust laws that might otherwise proscribe certain labor activities. In *Connell Co. v. Plumbers & Steamfitters,* 421 U.S. 616, 622, 95 S.Ct.

1830, 1835, 44 L.Ed.2d 418 (1975), the court noted that this exemption

> has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws.

In *Continental Maritime of San Francisco v. Pacific Coast Metal Trades Dist. Council*, 817 F.2d 1391, 1393 (9th Cir.1987), the Ninth Circuit noted that neither this circuit nor the Supreme Court has "enunciated a general rule" for determining if a particular activity is covered by the non-statutory exemption. The *Continental* court noted that the non-statutory exemption is "based on the recognition that national labor policy should sometimes override antitrust policy," and cited with approval the analytical standards applied to that exemption in *Mackey v. National Football League*, 543 F.2d 606, 612 (8th Cir.1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). *Id.* The *Mackey* court concluded that parties to an employment agreement that restrains trade are exempt from antitrust liability only if: (1) the restraint on trade primarily affects only the parties; (2) the agreement concerns a mandatory subject of collective bargaining; and (3) the agreement results from bona fide arm's-length bargaining. *Mackey*, 543 F.2d at 614 (citations omitted).

■ As discussed above, I conclude that defendants are entitled to summary judgment on the basis of the statutory exemption because the union has acted in its legitimate self interest, and because it has not "combined" with union contractors in the manner in which that term is applied to these claims. Even if the statutory exemption did not apply, defendants would be entitled to summary judgment because their activities at issue here satisfy the *Mackey* test. The first part of the test is satisfied because the activities at issue do not restrain trade: the OJTP is available on a nondiscriminatory basis to any contractor who signs a labor agreement with Local 48. There is no evidence that the union contractors who take advantage of the program either share bidding information, or fail to otherwise vigorously compete with each other for the projects. The record also establishes that nonunion contractors are allowed to compete on, and frequently secure, targeted projects.[3] It likewise supports the conclusion that the wage reduction granted union contractors on targeted projects is often insufficient to account for the failure of nonunion contractors to secure contracts on certain of the projects on which they bid.[4] Rather than restrain trade, by making union labor more competitive, it appears that the OJTP encourages more vigorous competition between union and nonunion contractors.

The second prong of the non-statutory exemption test is satisfied because wages are a mandatory subject of bargaining. *See, e.g., United Mine Workers v. Pennington*, 381 U.S. 657, 664, 85 S.Ct. 1585, 1590, 14 L.Ed.2d 626 (1965) (Wages are at the heart of issues about which employers and unions must bargain).

Finally, though I conclude that the OJTP is not the result of a "combination" within the meaning of the statutory labor exemption, the record supports only the conclusion that it is the result of collective bargaining between Local 48 and the union contractors. Based on the voluminous record submitted, a reasonable trier of fact could only conclude that the program was negotiated by the union and union contractors as an alternative to an across-the-board reduction of wages. The agreement authorizing the program, which allows union contractors to pay lower wage rates than otherwise specified in the collective bargaining agreement on a job-by-job

---

**3.** From the record submitted, it appears that between 1986 and January 1993, union contractors have obtained contracts on 3911 of 7213 projects on which job-targeting funds have been available.

**4.** Plaintiffs New Tech and Phoenix have produced bid files or bid quotes for 86 of the 282 jobs they assert they have lost because of the OJTP. It appears that the job targeting wage concession was a determining factor in awarding 12 of these 86 contracts.

basis, was signed by bargaining parties in April 1986.[5]

Application of the non-statutory exemption here is consistent with the underlying rationale for that exemption. Courts have recognized that organization of labor will inevitably have some effect on price competition, but that the goals of federal labor law could not be achieved if merely affecting business competition were a basis for invoking antitrust laws. The job targeting program at issue here indisputably affects competition between union and nonunion contractors. That is not a sufficient basis for applying antitrust laws to the program, however, and defendants' motion for summary judgment on the basis of the non-statutory exemption should be granted.

### B. *Antitrust Claims*

My conclusion that defendants are entitled to summary judgment based on the labor exemption from antitrust liability makes it unnecessary to address defendants' contention that the antitrust claims must fail on other grounds. However, to have a complete record as to the issues in dispute, I will briefly analyze the merits of plaintiffs' antitrust claims.

#### 1. *Claim 1: Sherman Act Section 1 Claim*

Section 1 of the Sherman Act, 15 U.S.C. § 1 prohibits "[e]very contract, combination in the form of trade or otherwise, or conspiracy in restraint of trade...." Plaintiffs allege that defendants have violated this section by pricing their services at predatory levels. They allege that defendant union contractors' low bids are explicable only as "an intention to create entry barriers and to discipline or eliminate competition from nonunion firms and thereby enhance the long-term ability of members of Oregon NECA to raise prices above competitive levels."

Courts have long recognized that, because restraint is "the very essence of contract," Section 1 would, if read literally, render the entire body of private contract law illegal. *See National Soc'y of Professional Eng'r v. United States,* 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363–64, 55 L.Ed.2d 637 (1978), citing *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918). Therefore, in evaluating restraints imposed by contracts or agreements, two complimentary categories of antitrust analysis have been developed. *Id.* at 692, 98 S.Ct. at 1365–66. The first category includes agreements "whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are 'illegal *per se.*'" *Id.* The second category covers agreements "whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Id.* Under this second prong of analysis, commonly referred to as the "rule of reason," "the fact finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

As noted in the two Findings and Recommendations filed earlier in this action, this case must be analyzed under the rule of reason. This rule requires that a claimant alleging a violation of Section 1 of the Sherman Act initially establish: (1) an agreement among two or more persons or distinct business entities; (2) by which the persons or entities intend to harm or restrain competition; and (3) which actually injures competition. *Les Shockley Racing v. National Hot Rod Ass'n,* 884 F.2d 504, 507 (9th Cir.1989). This requirement of an injury to competition is consistent with the frequent observation that antitrust laws were enacted "for the

---

5. Plaintiffs contend that the OJTP was not established through collective bargaining. Though I find that the record does not support that contention, a contrary conclusion should not alter the disposition of defendants' motion for summary judgment based on the non-statutory exemption.

The Ninth Circuit has applied the non-statutory exemption to agreements between unions and employers that are not the result of collective bargaining. *See Richards v. Neilsen Freight Lines,* 810 F.2d 898, 905 (9th Cir.1987).

protection of *competition,* not *competitors* ...." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697–98, 50 L.Ed.2d 701 (1977), citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

This is a highly unusual antitrust case. Predatory pricing, a generally ill-defined term, has been described as "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 117, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986). Allegations of predatory pricing are often supported by analysis of a producer's average total and variable costs. *See, e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,* 668 F.2d 1014, 1031–32 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982) (Predatory pricing occurs when a competitor sets low prices in order to drive out competition so that it can later charge monopoly prices and reap monopoly profits.).

This traditional pricing analysis serves poorly in the present action. Normally, one engaging in predatory pricing sells products at an artificially low level, sacrificing short-term profits for the long-term gains that might accrue if competitors are driven from, and then kept out of, the market. Here, we must begin an analysis of pricing by asking whose prices are relevant. The job targeting fund used to help union contractors obtain particular projects is funded by individual union members, who contribute 3.5% of their wages to the fund. What is the "cost" of labor to the laborers selling their services? As long as union workers charge more than minimum wage, which is the legal minimum at which labor can be sold, it is difficult to argue that laborers are selling their services below any generally recognized economic measure of costs. Union contractors taking advantage of the wage concessions on targeted projects do not, unless they choose to reduce the price of their services and materials in other ways, sacrifice any profit by reducing their bids to reflect lower labor costs. In that these competitors give up nothing in order to submit lower prices reflecting lower labor costs on targeted prices, it is hardly fair to speak of union contractors as pricing their services in a predatory manner. The union members themselves give up nothing more than the 3.5% of their wages that they have contributed on other work in order to fund the wage reduction on targeted jobs. An agreement under which union members negotiated an across-the-board wage decrease of 3.5% with union contractors clearly would offend no antitrust statutes. That the 3.5% reduction is accumulated and targeted to particular projects likewise does not appear to run afoul of antitrust provisions as a predatory pricing scheme.

Plaintiffs' peculiar predatory pricing allegations reflect the unusual nature of this action. Plaintiffs allege that the bids of Oregon NECA members

> are not merely low enough to meet non-union competition, but are at levels that, absent the subsidy, forego short run profit maximization, would frequently be below the total cost and, in selective cases, below the variable cost of the bidding members of Oregon NECA. At such levels, such bids are explicable only by an intention to create entry barriers and to discipline or eliminate competition from non-union firms and thereby enhance the long-term ability of members of Oregon NECA to raise prices above competitive levels. Such subsidized bid prices are well below those necessary for members of Oregon NECA to sell their services, are frequently well below cost, and are predatory. An agreement among competitors to charge predatory prices for the purpose of excluding lower cost and more efficient competitors from the market is a violation of [antitrust laws]. . . .

I find it significant that plaintiffs assert that the bids must be analyzed "absent the subsidy." It appears that, in fact, any analysis of the bids submitted by union contractors without taking into account the wage concession available on targeted jobs would be meaningless. Any analysis of what costs would be if they were in fact different appears to be hopelessly abstract: if the bidders' costs were different, it is fair to assume only that their bids would also be different. Labor

costs the union contractors whatever per-hour rate union employers are required to pay for labor on a given project. If these employers pay $15 per hour instead of $20, pretending that the labor actually costs $20 appears to be engaging in an insupportable fiction.

From this discussion, it is obvious that I seriously doubt whether traditional antitrust pricing analysis applies at all in this action. However, I will attempt to examine this action under traditional predatory pricing analysis. In doing so, I am guided by the cases cited above, and by the Supreme Court's recent decision in *Brook Group Ltd. v. Brown & Williamson Tobacco Corp.*, —— U.S. ——, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). Though the *Brook* Court considered a predatory pricing claim under Section 2 of the Sherman Act and price discrimination under the Robinson–Patman Act, several of its observations apply equally to the Section 1 claim at issue here. First, the *Brook* Court observed that only sales below cost should suffice to establish predatory pricing. *Id.* at ——, 113 S.Ct. at 2588. The Court based this conclusion on its observation that

> As a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting.

*Id.*

The *Brook* Court also noted that a competitor may be liable based upon low prices only if there is "a demonstration that the competitor has a reasonable prospect ... of recouping its investment in below-cost prices...." *Id.* The Court added that

> If market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed. In certain circumstances—for example, where the market is highly diffuse and competi-tive, or where new entry is easy ... summary disposition of the case is appropriate.

*Id.* at ——, 113 S.Ct. at 2589.

Finally, as to analyzing the possibility that a predatory pricing scheme might succeed, the Court observed that those selling at predatory prices may recovery their losses only where below-cost pricing can

> driv[e] [competitors] from the market, or ... caus[e] them to raise their prices to supracompetitive levels within a disciplined oligopoly.... The inquiry is whether, giv-en the aggregate losses caused by the below-cost pricing, the intended target would likely succumb.

*Id.*

Based on the guidance of *Brook Group* and the cases cited above, I conclude that a rea-sonable trier of fact could not find in plain-tiffs' favor on the predatory pricing claim based on the record submitted. First, plain-tiffs have not produced evidence from which a trier of fact could conclude that defendants are selling their services, identified either as the labor of union electricians, or the projects completed by the union contractors, below any reasonable measure of costs.

Further, defendants have submitted evi-dence establishing that the market for com-mercial/industrial contracting services is both "diffuse and competitive." The record dem-onstrates that more than 300 electrical con-tractors, less than one-third of which have signed agreements including job targeting provisions, now bid regularly on commercial industrial projects in the Portland area.

The record further establishes that non-union contractors frequently are awarded contracts on targeted jobs, and that union contractors compete vigorously among them-selves as well for targeted jobs. Given the wide range of bids received on some projects, it is apparent that both union and non-union contractors have significantly different (or at least calculate differently) costs other than labor. In addition, the record supports only the conclusion that barriers to entry in the relevant market are low.

Finally, defendants are entitled to sum-mary judgment on the Section 1 claim be-cause plaintiffs have not produced evidence

from which a trier of fact could conclude that not just competitors, but competition, is harmed by the practices of which they complain. *See, e.g., Les Shockley Racing,* 884 F.2d at 507.

### 2. *Claim 2: Sherman Section 2 Claim*

Section 2 of the Sherman Act, 15 U.S.C. § 2, proscribes monopolization, attempted monopolization, and conspiracies to monopolize. Plaintiffs allege that defendants violated this Section by conspiring to monopolize the market for commercial/industrial electrical construction business in the Portland metropolitan area.

Defendants contend that they are entitled to summary judgment on this claim because plaintiffs' claim is based upon a theory of "shared monopoly" rejected by the Ninth Circuit, and because they cannot establish that defendants had a "specific intent to monopolize" the relevant market. I agree.

### (a) *"Shared Monopoly" Issue*

In *Harkins Amusement Enterprises, Inc. v. General Cinema Corp.,* 850 F.2d 477, 490 (9th Cir.1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 817, 102 L.Ed.2d 806 (1989), the Ninth Circuit expressed serious reservations concerning the viability of a "shared monopoly" claim asserted under Section 2 of the Sherman Act. The *Harkins* court noted that Professors Areeda and Turner "admit that 'no case has held the § 2 monopolization provision applicable to shared monopoly,'" *id.* (citation omitted), and that "[o]ne court directly addressing the issue stated bluntly, 'an oligopoly, or a shared monopoly, does not in itself violate § 2 of the Sherman Act.'" *Id.,* citing *Consolidated Terminal Systems, Inc. v. ITT World Communications, Inc.,* 535 F.Supp. 225, 228–29 (S.D.N.Y.1982). The *Harkins* court concluded that, though it was not required to decide whether a shared monopoly might ever violate Section 2, in the case before it, "involving a small market with numerous sellers, no claim is stated under section 2." *Harkins,* 850 F.2d at 490.

Under the guidance of *Harkins,* I conclude that plaintiffs have not shown evidence from which a trier of fact could find for them on the Section 2 claim. In *Harkins,* the court characterized nine distributors as "numerous sellers," and a market consisting of Phoenix, Arizona, and its suburbs as small. Here, the record submitted shows that there are nearly 100 union contractors in the Portland metropolitan area. In the present action, with many more alleged participants in an alleged monopoly, the reasoning of *Harkins* requires the conclusion that plaintiffs' Section 2 claim must fail.

Plaintiffs contend that *Harkins* is inapposite because, while that action concerned a "shared monopoly," the present action concerns "a conspiracy to monopolize case with an identified potential monopolist—ONECA." They also assert that, if Section 2 requires that a single defendant possess the requisite market power, ONECA qualifies as the monopolist.

These arguments fail for two reasons. First, as noted above, Section 2 proscribes monopolization, attempted monopolization, and conspiracies to monopolize. If a monopolization does not offend that section because it is shared, liability cannot logically be premised on an attempt to create such a monopoly. Perhaps it is useful to think about the issue like this: Suppose Congress enacted a law making it illegal to import or to conspire to import ponies. If that law were interpreted as allowing the importation of horses, it could hardly be interpreted as proscribing conspiracies to import them.

Second, plaintiffs' contention that Oregon NECA satisfies any requirement of a single monopolist under Section 2 also fails. Oregon NECA is merely an association of contractors.[6] As a multi-employer bargaining agent, it negotiates collective bargaining agreements with the electrical union, and provides management and administrative services related to those agreements. It does not bid on, or perform, electrical contracting work. It does not distribute projects among its members, or share bidding information among its members. Nothing in

---

**6.** Plaintiffs' reliance on *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) is misplaced. The Associated Press, unlike Oregon NECA, actually sold a product.

the complaint or the record submitted suggests that Oregon NECA can in any way be considered a "competitor." There is likewise no suggestion that any one or small group of the contractors who belong to Oregon NECA have or could obtain monopoly power. As mentioned previously, nothing in the record suggests that the members of Oregon NECA do not compete vigorously among themselves.

### (b) *Specific Intent to Monopolize*

My conclusion that defendants' motion for summary judgment on the Section 2 claim should be granted for other reasons makes it unnecessary to reach the question whether summary judgment is appropriate on the grounds that plaintiffs have not shown evidence from which a trier of fact could conclude that defendants specifically intended their elimination. I will nevertheless briefly address the issue.

Though *Eichman v. Fotomat Corp.,* 880 F.2d 149, 162 (9th Cir.1989) raises the issue whether all defendants must have a specific intent to monopolize in order to incur liability under Section 2, Ninth Circuit decisions have frequently cited the specific intent requirement. *See, e.g., Hunt–Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 926 (9th Cir.1980), *cert. denied,* 450 U.S. 921, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981); *Christofferson Dairy, Inc. v. MMM Sales, Inc.,* 849 F.2d 1168, 1174 (9th Cir.1988).

Having thoroughly reviewed the record, I conclude that plaintiff has not shown evidence allowing the conclusion that defendants specifically intended to monopolize the relevant market. At the outset, I note that it is union members who contribute the funds needed to fund the OJTP, and a union, Local 48, that has negotiated the agreements making those funds available to Oregon NECA members. Unions have a legitimate, statutorily permissible objective, the organization of the work force: organization of the entire work force in any particular area by legiti-

mate means would offend no law or federally-recognized public policy.

The record does show that some non-union contractors have joined Oregon NECA.[7] The record likewise shows that the leadership of Local 48 has promoted the OJTP as a means of organizing non-union contractors. The record also supports the conclusion that the OJTP has allowed members of Oregon NECA to compete more effectively with non-union contractors.[8] This evidence is not, however, sufficient to establish defendants' specific intent to monopolize the market. The record submitted would not support the conclusion that non-union contractors have been forced out of business by the OJTP: Plaintiffs have identified no non-union contractors who have been forced out of work by the program. So long as their actions are otherwise lawful, a union is permitted to attempt to organize all workers in a given area of employment. That is a long-recognized right reflected in the statutes cited in the discussion of the statutory labor exemption. As to the union contractors, even the elimination of a number of non-union contractors does not result in monopolization. The union contractors continue to compete among themselves, including any formerly non-union contractors who choose to join Oregon NECA. The record would not support the conclusion that, through the use of the OJTP and other practices complained of here, any particular Oregon NECA member intends to monopolize the relevant market. In the absence of such evidence, I conclude that plaintiffs cannot show a specific intent to monopolize within the meaning of Section 2.

### C. *National NECA's Motion for Summary Judgment on Other Grounds*

National NECA contends that, even if it were not entitled to summary judgment on the grounds discussed above, it is entitled to summary judgment on other grounds. It contends that plaintiffs have not produced evidence from which a trier of fact could

---

7. Tigard Electric, formerly the lead plaintiff in this action, has subsequently joined Oregon NECA and has signed a bargaining agreement with Local 48.

8. The record also supports the conclusion that some non-union contractors, including plaintiffs Phoenix Electric and New Tech Electric, are financially robust and in no danger of imminent demise.

**1516**

conclude that it acted as National NECA's agent with respect to the OJTP, or that National NECA played an "active role" in the alleged predatory pricing and monopolization conspiracy. Because I have concluded that National NECA is entitled to summary judgment for the reasons discussed above, I need not reach this issue. In order to make this record complete, however, I note my conclusion that National NECA is not entitled to summary judgment on these alternative grounds. The record submitted demonstrates that material issues of fact remain concerning questions of agency and the extent to which National NECA might otherwise share responsibility for the policies at issue.

III. *Plaintiff ABC's Motion for Summary Judgment on Claim 2*

Obviously, from my recommendation that defendants' motion for summary judgment on this claim be granted, I have concluded that plaintiffs are not entitled to summary judgment on this claim.

## CONCLUSION

I recommend DENYING plaintiff ABC's motion for summary judgment on the second claim (# 169).

I recommend GRANTING plaintiff ABC's motion for summary judgment on defendant National NECA's counterclaims (# 174).

I recommend GRANTING defendant National NECA's motion for summary judgment on plaintiffs' claims (# 177).

I recommend GRANTING defendant Oregon NECA's and defendant IBEW 48's motion for summary judgment on plaintiffs' claims (# 182).

DATED this 24th day of February, 1994.